UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| SHONTO PETE,<br><br>                    Plaintiff,<br><br>          v.<br><br>OFFICER JAMES JAY OLSEN and<br>the CITY OF SPOKANE,<br><br>                    Defendants. | NO. CV-09-54-EFS<br><br>**ORDER GRANTING THE CITY OF SPOKANE'S MOTION FOR SUMMARY JUDGMENT** |

     A hearing occurred in the above-captioned matter on March 12, 2010, in Richland. John J. Kannin appeared by videoconference, and Blake Wolfe Horwitz appeared telephonically for Plaintiff Shonto Pete ("Pete"); Ellen O'Hara appeared by videoconference for Defendant City of Spokane ("City"); and Robert Roy Cossey appeared by videoconference on Defendant James Jay Olsen's ("Olsen") behalf. Before the Court was the City's Motion for Summary Judgment (Ct. Rec. 21). For the reasons stated below, the Court grants the City's motion.

ORDER * 1

# I. Background[1]

This case dramatically illustrates why guns and alcohol should not mix. Olsen was a Spokane Police officer. The evening of February 25, 2007, Olsen drank about half a whiskey and cola at home and took the other half on the road with him. (Ct. Rec. 23 Ex. A at 38, 82.) He also took his personal pistol, which he put in his waistband, even though he knew it was against Spokane Police Department policy to carry a firearm while drinking. *Id.* at 34, 36, 48. He was off duty and not wearing his uniform. *Id.* at 34. Olsen met a friend at a bar in downtown Spokane and continued to drink until the bar closed in the early hours of February 26. *Id.* at 37. After leaving the bar, he and his friend walked to the friend's car so that she could drive him to his truck. *Id.* They drove to the truck and parked behind it. *Id.* at 37-38. A blood test indicated that Olsen's blood alcohol content at this time was between .08 and .13. *Id.* at 71-72. The pair sat in the car talking, and Olsen's eyes became heavy.

Meanwhile, Shonto Pete was drinking and playing pool with his wife and some friends in two different bars in the same neighborhood. *Id.* at 83-84. Pete was planning to ride home with his wife, but they got into an argument and she left without him. *Id.* at 85. He became heavily

---

[1] The following background is based on the exhibits attached to the Declaration of Leesa Van Zandt (Ct. Rec. 23 Ex. A), which include Defendant Olsen's law enforcement training records, the Spokane Police Department's "Policies and Procedures" manual, Olsen's and Pete's testimony at the criminal trials that followed these events, the verdicts from those criminal trials, Olsen's letter of resignation, and the Personnel Action Authorization following the resigation.

ORDER ~ 2

intoxicated that night; his blood alcohol content reached .22. *Id.* at 84. After he was ejected from the second bar for falling asleep, he looked for a ride home on the street. *Id.* at 85. He would have had a long walk home on a cold winter night. It was at this time that he found Olsen's truck. *Id.* at 86.

Pete and Olsen disagree about what happened next. According to Pete, the truck was unlocked and its engine was running. *Id.* Because he saw Olsen and his friend, however, he approached the car in which they were sitting and talking. *Id.* at 89. When he asked for a ride, Olsen swore at him, and Pete decided to go on his way. *Id.* Olsen says that while he drifted off to sleep his friend noticed that the truck was driving away. *Id.* at 40. The friend chased after the truck, speeding through the streets of downtown Spokane, until finally Pete stopped and ran out the truck. *Id.* at 40–47.

The parties agree that Olsen chased Pete on foot until they jumped over a barrier and ran towards the river. *Id.* at 54–59, 92–95. Olsen yelled something like "stop" or "stop, get down!" *Id.* at 63. Olsen says that Pete turned around suddenly and that he thought Pete had a firearm; Pete says he turned around to continue fleeing after asking Olsen why he was giving chase. *Id.* at 63–64, 95. In response, Olsen fired five times, grazing Pete's scalp once. *Id.* at 26, 65–66. Olsen never identified himself as a police officer or gave Pete any orders except for "stop" during the chaos. Pete continued running downhill until some neighborhood residents called 911. *Id.* at 27–29. Olsen never called 911, although he had a cellular telephone with him at the time. *Id.* at 49, 104–05.

ORDER \* 3

Pete was prosecuted for taking a vehicle without permission and was acquitted. *Id.* at 121. Olsen was prosecuted for first-degree assault and reckless endangerment and was acquitted based on the jury's finding that he acted in self defense. *Id.* at 122-27. Immediately before a disciplinary hearing with the Spokane Police Department to discuss the shooting, Olsen resigned his position rather than face termination. *Id.* at 128-31.

## II. Discussion

### A. Standard

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Once a party has moved for summary judgment, the opposing party must point to specific facts establishing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). If the nonmoving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant the summary judgment motion. *Id.* at 322. "When the moving party has carried its burden of [showing that it is entitled to judgment as a matter of law], its opponent must do more than show that there is some metaphysical doubt as to material facts. In the language of [Rule 56], the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (citations omitted) (emphasis in original opinion).

ORDER * 4

When considering a motion for summary judgment, a court should not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). This does not mean that a court will accept as true assertions made by the non-moving party that are flatly contradicted by the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

**B.   Analysis**

The City argues that Olsen was not acting under color of state law when he shot Pete and that it is not liable for Olsen's acts as a private citizen.

**1.   Color of Law**

To succeed on a § 1983 claim, a plaintiff ordinarily must demonstrate deprivation of a constitutional right by a person acting under color of state law. *Dang Vang v. Van Xiong X. Toyed*, 944 F.2d 476, 479 (9th Cir. 1991). "It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the state. Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 49-50 (1988) (citations omitted). "Under color of state law" means under pretense of state law. *Screws v. United States*, 325 U.S. 91, 111 (1945). There is no such pretense if the wrongful acts are wholly unrelated to

ORDER ~ 5

the employee's duty. *Murphy v. Chicago Transit Auth.*, 638 F. Supp. 464, 467 (N.D. Ill. 1986) (citing *Johnson v. Hackett*, 284 F. Supp. 933, 937 (E.D. Pa. 1968)). "[A]ctions taken under color of state law must be related to the state authority conferred on the actor, even though the actions are not actually permitted by the authority." *Dang Vang*, 944 F.2d at 480 (citations omitted).

The Ninth Circuit determined that in circumstances very similar to this case an off-duty sheriff's deputy did not act under color of state law. *Huffman v. County of Los Angeles*, 147 F.3d 1054 (9th Cir. 1998). In that case, the non-uniformed, intoxicated deputy shot and killed his adversary in a barroom brawl. *Id.* at 1056, 1058. He used his private weapon, although it was loaded with ammunition provided by the County. *Id.* at 1056. He never identified himself as a deputy or gave commands to the victim. *Id.*

Like the deputy, Olsen did not act under color of state law. In no way were Olsen's actions related to his official duties. He chased Pete while off duty and not in uniform in order to protect his private truck. He shot Pete with his own firearm. He never identified himself as a police officer or gave any commands other than "stop," which is something a civilian might say when chasing a suspected thief. Therefore, this case is factually indistinguishable from *Huffman* in all relevant respects.

Pete asks the Court to focus on Olsen's actions, which he tries to characterize as typical of police officers. As examples, he says Olsen chased Pete; made a traffic stop; shot Pete in self defense; was authorized to enforce the law at all times; pursued and shot Pete in his usual patrol district; and did not call for backup or call 911.

ORDER * 6

These conditions do not amount to color of law. The undisputed acts Pete describes do not indicate that Olsen abused his authority as a police officer. Private persons, however ill-advised, have been known to chase those suspected of stealing their property and to shoot them in self defense. Indeed, self defense is available to all defendants in criminal prosecutions. In no way did Olsen use the cloak of official authority when he shot Pete. By all accounts, he never attempted to get Pete to submit to his authority as a police officer. Olsen's failure to call for backup tends to prove that he was not acting under color of law, because only a police officer could call for backup. And Olsen's failure to call 911 or to report the incident does not tip the scales for or against finding that Olsen acted under color of state law. A private citizen who pursues and shoots an unarmed person might hesitate to call 911. Even if he was authorized to enforce the law at all times, there is no indication he was required to do so,[2] or that his motivation to assault Pete was anything other than personal. That he shot Pete in his usual patrol district was no more than happenstance.

Pete's counsel relies on *Screws* to show that Olsen's actions indicated he was an officer. That case presented a completely different set of facts. There, three law enforcement officials served a warrant on an individual, arrested him, and beat him to death to settle a personal vendetta. 325 U.S. at 92-93. The Supreme Court had no difficulty holding

---

[2] *Cf. Stengel v. Belcher*, 522 F.2d 438, 441 (5th Cir. 1975) (holding that an officer acted under color of state law when he intervened in a dispute while off duty and non-uniformed in part because a department policy required him to intervene).

ORDER * 7

that those officers acted under color of state law because they arrested and assaulted the victim in order to protect themselves and keep a prisoner from escaping. *Id.* at 107. That was clear "'[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Id.* at 109 (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). In contrast, Olsen never arrested Pete or did anything else to indicate he was a police officer. His conduct was not made possible "only because he [was] clothed with the authority of state law." As discussed, a person wholly lacking in state authority might pursue a person he believes is stealing his property and, though imprudent, shoot that person.

Moreover, Pete's reliance on *United States v. Giordano*, 442 F.3d 30 (2d Cir. 2006), is misplaced. In that case, the Second Circuit upheld the conviction of a former city mayor for 18 U.S.C. § 242[3] violations based on his repeated sexual abuse of two minors. *Id.* at 33. The court found sufficient evidence that the defendant acted under color of law because he told the victims he could jail them or their families if they reported the abuse. *Id.* at 46. That case is only an application of the rule that an individual can violate the law for personal reasons while still acting under color of state law. *See*, *e.g.*, *Dang Vang*, 944 F.2d at 840. In contrast to Giordano, Olsen never invoked his authority as a police officer to subdue Pete. Nothing about his pursuit and use of force

---

[3] This criminal statute forbids civil rights violations and contains a "color of law" element. The meaning of "under color of law" is the same under both § 242 and § 1983. *United States v. Price*, 383 U.S. 787, 794 n.7 (1966) (citations omitted).

ORDER * 8

indicated anything other than that he was a pistol-packing civilian trying to protect his truck.

Olsen pursued his private interests and never used his authority as an officer to influence Pete. *Cf. Abdi v. Lovell*, No. CV-08-0321-PHX-GMS, 2009 WL 976503, at *3-4 (D. Ariz. Apr. 9, 2009) (holding that an officer pretended to act in the performance of official duties when he identified himself as a police officer and threatened to arrest the plaintiff multiple times). He may have influenced Pete by chasing him and firing at him, but he did not try to influence him as a police officer. Therefore, Olsen did not act under color of state law. Because Olsen's actions were not under color of state law, the Court need not address Pete's argument that the City authorized or ratified the shooting.[4]

**2.   Failure to Train/Deliberate Indifference**

The Court concludes that Pete was acting as a private citizen. Ordinarily, government entities are not liable under § 1983 for their failure to protect individuals against harms caused by private citizens. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989) ("[a] State's failure to protect an individual against private violence . . . does not violate the due process clause"). In two limited circumstances, however, they are liable. The first exists if the state takes a person into custody and the person suffers injury as a result of

---

[4] The Court notes, however, that the City presented uncontroverted evidence that it its policy prohibited its officers from carrying firearms while drinking, that Olsen recognized he violated City policy, and that the City would have terminated Olsen had he not first resigned. (Ct. Rec. 23 Ex. A at 18, 30, 32-36, 128-31.)

ORDER * 9

unsafe conditions. *Wang v. Reno*, 81 F.3d 808, 818 (9th Cir. 1996) (citations omitted). This exception does not apply to this case because Pete was not in custody at the time of the shooting. Second, the government may be liable if it affirmatively places the plaintiff in a dangerous situation. *Wood v. Ostrander*, 879 F.2d 583, 600 (9th Cir. 1989). A city policy affirmatively places the plaintiff in danger if 1) the plaintiff was deprived of a constitutional right; 2) the municipality had a policy; 3) the municipality was deliberately indifferent to the possibility that constitutional violations would occur as a result of this policy; and 4) the policy was a moving force behind the violation. *Van Ort v. Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996).

Pete claims that the City was deliberately indifferent to the possibility that its off-duty police officers might shoot innocent civilians. To support this claim, he points out that the City encourages off-duty officers to carry concealed weapons, and state law permits police officers to do so without a concealed-weapon permit.

The Court once again finds *Huffman* instructive. The County in that case had a policy prohibiting off-duty deputies' drunk and disorderly behavior. 147 F.3d at 1060. The plaintiffs in *Huffman* argued that the County also should have specifically warned its Sheriff's deputies about "the dangers of mixing alcohol and firearms." *Id.* The Ninth Circuit rejected this argument and held that County's policy did not create a foreseeable danger to potential shooting victims. *Id.* at 1061. Although that County could have done more to prevent shootings, it simply could not have foreseen the deputy's "lethal private acts." *Id.* at 1060. Therefore, that County did not violate the decedent's rights. *Id.* at 1061.

ORDER ~ 10

The City's policy in this case was more protective of the rights of potential shooting victims than the County's in *Huffman*. The *Huffman* plaintiffs claimed that Los Angeles County required its off-duty deputies to carry firearms, *id.* at 1059-60, while the City merely encouraged its off-duty officers to do so. (Ct. Rec. 23 Ex. A at 18.) Additionally, the City specifically instructed its officers not to carry their firearms while drinking. *Id.* As Olsen acknowledged, the City trained him in its policies and he violated them, and he had no record of misconduct to suggest that he was dangerous. *Id.* at 30, 32-36, 103-04. The Court cannot conclude that the City affirmatively created a foreseeable danger to Pete with deliberate indifference.

### III. Conclusion

While the Court recognizes and laments the serious injury that Mr. Pete suffered, it concludes that the City of Spokane is not legally responsible for that injury.

Accordingly, **IT IS HEREBY ORDERED:**

1. Defendant City of Spokane's Motion for Summary Judgment **(Ct. Rec. 21)** is **GRANTED**.

2. The District Court Executive shall enter judgment in favor of the City of Spokane.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and distribute copies to counsel.

**DATED** this ____15th____ day of March 2010.

S/ Edward F. Shea
EDWARD F. SHEA
United States District Judge

Q:\Civil\2009\54.SJ.wpd

ORDER * 11